Case number 5 is Giles v. Gabrielle Tobeck and others, I think we can change the name of the case since some people are no longer involved, Ms. Y. Brandt. Good morning, your honors. And may it please the court, Katherine Winn-Brandt for Appellant John Giles. Viewed in the light most favorable to Mr. Giles, the evidence in this case was sufficient for a jury to find deliberate indifference. So summary judgment was inappropriate. The prison considered inmate KM so dangerous that he was allowed outside of his cell only when all other inmates were locked safely inside their own. And Officer Tobeck. Ms. Winn-Brandt, one question. What is the moment at which we should begin assessing the conduct of these three people who are left? Because yes, Mr. Moore was clearly a bad actor. And they knew that and so on. And the district court agreed. There was a mistake made. He never should have been out there. But a mistake or negligence isn't the same thing as deliberate indifference. If you look at once the problem starts, kind of from the moment that Moore starts sprinting up the stairs and pounding on Scott, things happen pretty quickly. I mean, this is not a lengthy encounter. And so you wonder, the guards were deliberately indifferent because they didn't take care of it in one minute instead of three? Or it's deliberate indifference because they allowed the whole situation to arise to begin with, which wasn't the fault of some of the responders. Right, so we believe that it's relevant to start looking at what happened at 3 o'clock when the officers start their shift. But the point at which the objective risk reaches the relevant point is at 315 when Officer Tobeck opens the doors. So you have four minutes when Officers Tobeck and Officer Meehan can see that KM is out. They can see his empty cell. It's a big room. And there's no chaotic situation going on. And then they sit there. But the logic of your view seems to be from then at 315 onward, anything amiss that happens in the day room represents deliberate indifference on the part of at least Tobeck. Is that right? Well, not necessarily anything amiss. The risk here is that KM is going to start an altercation with other inmates and start a fight. What if he just throws a bottle of a cup of coffee in somebody's face, something hot? He's in the day room, shouldn't be there. He's secretly holding a cup of coffee and he shoots it in somebody's face, and that would hurt. Well, if she has seen him in the day room. Is that an Eighth Amendment violation? If she's seen him in the day room and knows that he's out and hasn't done anything, then that's an Eighth Amendment violation. But here what we have is worse. We have them sitting there for four minutes when they can see KM out there. So you're saying that she lost the opportunity to find somebody to escort him back to his cell. She could have escorted him back to his cell starting at 315 when she could see him out. And it would be a trickier case if. But who was left in the day room at that point if she had escorted him back? Officer Meehan, who's sitting right next to her at all relevant times. Well, it was four minutes after 315, so about 319, that she first noticed him. Well, so we believe that the evidence suggests that she first noticed him out. She saw him out at 3 o'clock. And she first noticed him out after the inmates were exposed starting at 315 when she could see his empty cell. And she's sitting in this big room before anything. There was testimony that it was four minutes later that she noticed him. Her testimony is that four minutes later, she first realizes that he's out. Right, I said testimony. Right, so on summary judgment, we believe that the version of this that you should take into account is that she can see him out before 319. Because that's what you see on the video, that it's an empty room and he's out. And she can see his empty cell. Well, I'm not sure you draw that. All right, I don't understand why you say the video counts, but her testimony doesn't count? Well, she is the defendant, so. I understand that. So on summary judgment, we look at the video. So you're just saying for summary judgment, a jury might not. Right, a jury might not. We have to ask a question about her mindset, right? Exactly. And here's what concerns me a bit with your position, is that, and you can see it on the video, when Moore walks by the desk, I believe that there's no evidence to the contrary that Toback says, go back to your cell in substance. Go back to your cell and lock down. Right. Right? How does that, that statement seems significant to me. It is significant. Because it doesn't evidence a mindset of exposing other inmates to risk or to harm. She recognizes this guy shouldn't be out, and she's saying, go back and lock down. And then, he actually walks in the direction of his cell. Now, it just so happens that the staircase is there, and we have the problem that ensues. Right. But how from that comment are we doing to conclude that there's a genuine issue of fact on deliberate indifference? He even said, okay, Toback, right? They say, the defendants say, he said, okay, Toback. And when you watch the video from that second angle that the security footage shows, you can see that he doesn't break stride. He doesn't make sustained eye contact with Officer Toback. This is not a situation where the inmate is, you can see a little conversation. He didn't begin walking towards his cell? He keeps walking in the direction he was walking in, which is both toward his cell and the direction of the other inmates. Well, then that's, okay. So, he did continue walking towards his cell. He did continue walking towards his cell, but Officer Toback knew that walking toward the other inmates was a huge risk. And so, when she says, go lock yourself up, you can see that she's drawing the inference that a real risk exists, and that's crucial. And then you ask whether telling an inmate who the prison has judged to be so violent that he can't be out of his cell with other inmates ever to lock himself back up, you ask whether that's a reasonable action. And we submit that that's not a reasonable action. So, your position has to be that that crossed the line to recklessness. Right. To think that he would cooperate as opposed to grabbing him by the arm and saying, I'm going to navigate you around these other prisoners who are now coming. Right, and we're not suggesting that she needs to attack him. We're suggesting that she needs to rise from the seat. But he did say, okay, right? That's what the defendants say, and Mr. Giles couldn't be there to hear otherwise. So. So, before you run out of time, I just want to say that we've been talking about Toback. The other two do seem to have intervened quite quickly. I mean, again, I'm having a little trouble figuring out in some perfect world, what would they have done? Right, so we don't suggest that they committed a constitutional violation by getting up the stairs too slow. But once they get up the stairs and they're at the scene of the assault off camera, our client's testimony is that Officer Meehan just stands there the whole time, which is exactly what this court has said is the paradigm case of deliberate indifference. And Officer Mayo intervenes, and then after handcuffing Mr. Giles, he stands there for a significant period of time. And so that situates him identically to Officer Meehan in that scenario. Didn't Moore tell the other inmates to stay away from the fight? Yeah, Moore is the assailant. I'm sorry. I mean, Meehan, Meehan. That's disputed, that is for the jury to decide. And I'd like to save the last two minutes for rebuttal, if that's all right. Okay, that's fine. All right, Mr. Mathis, Matthews. May I please the court? David Matthews on behalf of the defendants Mayo, Meehan, and Toback. The district court is fundamentally correct that the defendant's actions do not permit any reasonable jury to infer that they infectively condoned the inmate-on-inmate violence under cases like Lewis, interpreting deliberate indifference. Effectively condoning the violence is the standard. So I want to talk a little bit about Toback as opposed to Meehan and Mayo. Your position has to mean that if you've essentially knowingly set the table for violence, you're still not responsible for it if violence ensues. Because that's what I'm trying to explore with the recklessness. When we know that Moore is somebody who's on 23-hour lockdown, he has to be all by himself in the room, we know a lot of negative things about Moore. And Toback recognizes the mistake that she's made pretty quickly. I mean, I don't care if it's like instantaneously or for four minutes, but she doesn't at that point. As Moore is sauntering by, she doesn't say, I'm going to, or ask Meehan or something, I'm going to escort you to your cell. And I don't see anything, nothing violent has happened yet. So it's not like you're asking an officer to walk into the middle of a melee. Had Toback been under control as the other inmates are coming down from the stairs, there's every reason to think the problem wouldn't have arisen and Moore wouldn't have begun pummeling the cellmate. Judge, I'll go back to your first question, which is, does my position assume that if someone sets the table for violence, then you're off the hook? And I would answer that emphatically, no. And to that, I would point to this court's decision in Guzman versus Sheehan, which is a 2007 case. And they're talking about what happened here where there's at least allegations, in that case, it's allegations here, we would acknowledge it, that the guard violated a policy that made the situation worse than otherwise would have been. And what Guzman says, and the pin site to that is 495F3rd at page 858. It says that a violation of this nature does not give rise to deliberate indifference in the language, especially when there are continued steps aimed at stopping the situation. And that's what we see with Toback. She doesn't- But do we see that? I mean, on summary judgment, yeah, of course. I mean, a mere violation of a prison rule is unequivocally not enough to show an Eighth Amendment violation. You've got to show the standards for the Constitution. But the rule's already been violated by this time. Everything is wrong, and she realizes that this guy is your proverbial cobra heading toward the other inmates and does nothing. May I respond to that, Judge? And that's exactly why her action should be looked at as reasonable. An officer doesn't have to be perfect, but the officer does have to be reasonable in her response. I mentioned this on the brief that had she done anything- So leaving him entirely unattended and just assuming he's the kind of law-abiding sort of guy who's gonna obey an order? She didn't leave him unattended. The first thing she did was give an order, and she saw, as one member of this panel, I think, other argument pointed out, she saw signs that he was obeying the order. What you see in this case for both Toback and the other officers is you see them going through what in other cases get referred to as a continuum of force. They start out with giving orders. Eventually, you find out that doesn't work. Then when they get to the top of the stairs, there are shouts, and they start physically involving, and finally, the miscreant who starts this whole matter ends up getting tasered, which is something I think is relevant to show that there's not- Yeah, after Mr. Giles has been rather viciously bitten, but yes. Mr. Giles, I would question how vicious it is if you don't need stitches, but it is a secondary matter. What Officer Toback does is gives an order rather than jumping up, which could have escalated the situation. We don't know what would have happened if she jumps up. Why do you think she would have had to jump up? Why couldn't she just have calmly gotten up and saying, oh, you're out of your cell. I'm going to walk back with you. That's certainly possible that she would have done that. It's also very reasonably possible, given Mr. Moore's history and his behavior, that as soon as she gets up, he would have turned on her, turned on another inmate, and further escalated the situation. Is it better to assume he was going to behave himself? That seems like fantasy land. I would disagree with the characterization as an assumption that he was going to be behaving himself. I would say- Well, that's what she assumed. She said she was going to give him an order, go back to your cell and lock up. Everything would be fine. He was going to be a boy scout about it and just go and get into his cell. What reason was there to believe that of Moore? One reason there is to believe that is when she first sees him out, he hasn't done anything bad yet. And I do want to reference this for seeing him out. Can I ask you a question about that? There's some references in the briefing to, at one point, and I'm really not clear on this, at one point that Moore was hiding in the shower. That's exactly where I was going, Your Honor. And that is Mr. Giles' testimony. And Mr. Giles says in his deposition that Moore was hiding in the shower. Now, the defendant's position is that may have been true, it may not have been true, but it's Mr. Giles' testimony, his deposition under oath, so we can assume that's true. It's only now that we get into the appellate courts that we're hearing all the arguments about while Giles was out, Moore could have, Officer Toback could have seen him. That's not actually what Mr. Giles said. And that brings me to another point I would like to make about the difference between Mr. Giles' sworn. Hold on a second, though. I'm sorry, Judge, go ahead. You're saying we should assume, for purposes of the record, that Moore was hiding in the shower? The reason I'm concerned about that is, what does that mean, lying in wait for Scott? I'm not entirely sure what Mr. Giles meant. I just know what he said, and what I'm saying is the court may assume, given the summary judgment posture, given that Mr. Giles said that, and none of my witnesses can definitively say otherwise, you can assume that. Unlike the plaintiffs who seem to be arguing that even though Mr. Giles can't say no, when my clients say yes, that should somehow be viewed with skepticism. But your point, Toback and Meehan, there's no evidence in the record that they had knowledge that he was hiding in the shower. There's no evidence in the record that they had knowledge that he was hiding in the shower. There's no evidence one way or the other that whether they did or didn't see him. The evidence is Officer Toback made a mistake, and when she opened it, and her testimony, and that's not disputed, is that she saw him out. She told him to go lock up, and she saw visual signs of compliance. I think that if she told him to go lock up, and she saw him go a different direction, or she saw something different. He did say okay, Toback. He absolutely said that. If he would have said something else. It sounds like kind of a disrespectful way to do it, by the way, but yes. Well, I wouldn't have the highest standards for inmates for respect. I think you might take what you can get if you're the officers. To just briefly touch on an issue I was mentioning when it comes to Mr. Giles' testimony. Mr. Giles submitted his declaration at some re-judgment that directly contradicted his deposition, and that is something that this court for 30 years has disapproved of through what they. I don't think it was a direct contradiction. I mean, I'm not sure that's what's gonna. Well, Your Honor, if you look at page. I know you had your chart. Page nine on the brief. He's asked an open-ended question in his deposition, and he says 10 to 15 seconds. Then he comes to his. And then he estimates 35, 40. I mean, really, is that? I think it is a relative distinction. I don't think, no, no, no. I mean, we forgive discrepancies like that all the time when the police are there and the police officer says something happened 10 to 15 seconds, and then the next time he thinks about it, he says, oh, it's 30 to 45. Well, it's interesting that you bring up the next time because Mr. Giles gives that answer multiple times. He doesn't change his answer throughout his deposition, which would be a different case. He changes it as soon as he realized it's bad for him on summary judgment. I don't, well, I mean, it seems to me like a trivial recollection. I would say what isn't trivial, I'm sorry, Your Honor, I didn't mean to interrupt you. No, go ahead. I would say it's not trivial, the difference between as to Officer Meehan and Mayo when Giles says, I don't know, I don't know, I don't know, when suddenly his deposition, he says they were standing around. The plaintiff says that I pulled the sham affidavit and that those quotation marks were based on nothing. That's not correct. That's a term the court has used. The plaintiff also cites a couple of cases saying that these declarations should be accepted. What they don't tell you in their reply brief is that neither of those cases did the declaration contradict a deposition. One case that they cite- I guess, again, I'm just taking some issue with your decision to characterize this as a flat-out contradiction. I don't see that. And I'm sure the state wants to be careful about what it asks for because if we really cranked up the standards on this, a lot of police testimony would go out the window too. I understand the court's concern and even if I would still maintain that I'm bringing up these issues because of the way that the plaintiff has emphasized them and that's my response, that's not what he said the first time. This is summary judgment and I would also say that to the extent the court doesn't see a difference, it only benefits my clients because it shows not only did they respond quickly, they called for backup, they waited as was appropriate according to this court's precedent and on top of all these other things, Mr. Giles, as I argue in my brief, he joined a confrontation in progress. The officers didn't know- We thought Scott's life was at risk. He thought that Moore was going to hurl Scott off the balcony down a floor. Judge, may I- Of course, I know my monitor. May I respond to that and then sit down? To the extent that's true, the officers certainly didn't know that and so that doesn't weigh into their deliberative difference. They had to respond to what they saw, which is break up a fight, which they did and with that, I would ask this court to affirm Judge Darrell's opinion. All right, thank you. Anything further this morning? I'd like to first briefly clarify that the difference between hiding in the shower and being in the day room, when you watch the second view of the video, you can see the showers line the day room and you can see what's happening underneath. So the shower versus day room distinction, we don't believe is material. But to Judge Wood's question about setting the table for violence and then letting it play out, I would encourage this court to look at Pete versus McCann, where the officer set the table for the violence and then shortly after, broke up the fight. This court has never said that an officer's actions after the fight that may be helpful, negate a claim of deliberate indifference beforehand. And to Judge Scudder's question about what was reasonable for Officer Toback to do after she saw Pam right in front of her, this court in mayoral said that it can be deliberate indifference to abdicate your responsibility and trust another inmate to carry out what you hope is gonna happen. And I would also point you back to the video where you don't see any sign of compliance from inmate Moore. You see inmate Moore walk straight in the same line that he was going. Well, wait, it's not you don't see any sign of compliance. If he's walking in the same direction to his cell, how do you show anything to him? Either way. So that is a fair point and it's a point for the jury to resolve on summary judgment. That's exactly what summary judgment standard is for. I mean, if you're going later. It all happens really fast too, or at least that's the impression that I have from both reading the papers and looking at the brief. He walks in front of the desk. And so, and I myself have thought about, should she have escorted him? Should she have gotten up and made? But it happens instantaneously. And that's why we encourage the court to look at the evidence starting at 315 and not at 319. And again, in that second view of the security footage, you see Cam walking toward her in her line of sight for at least 15 seconds on the video. It's not just that second view where you can only see him walk right past. And so we think that a jury could look at this video and find deliberate indifference here. And so summary judgment could not have been appropriate. Thank you. All right, thank you. And thank you as well for accepting our request to help Mr. Giles. We appreciate your efforts and those of your firm. Thanks as well, of course, to Mr. Matthews. All right.